We'll hear in Re15375Memorial Corp. May it please the Court, John Demme of Stevenson Lee for the debtors Re15375Memorial Corp and Santa Fe Minerals, Inc. who are some of the appellants in this matter. There's actually three consolidated appeals, Your Honor. At the outset, I would like to reserve two minutes for rebuttal. That's granted. Thank you, Your Honor. I would like to also advise that Mr. Eisenberg and myself have split our 15 minutes. We're not sure if I would use the rebuttal or if he would. We'll decide that. Either one of you, but not both. Correct. Thank you, Your Honor. It's fine. Your Honor, this appeal, in our view, there are two basic questions. And the first relates to the standard of review that the district court applied to the bankruptcy and reviewing the bankruptcy court opinion. And the question is, did the district court apply the proper standard of review? We do not believe that in actuality that it did. The standard of review is quite clear from this court's decision in SGL Carbon in connection with the motion to dismiss is abuse of discretion. The abuse of discretion standard implies that the factual findings of the bankruptcy court are to be analyzed on a clearly erroneous basis. Of course, questions of law are to be applied on a de novo basis or to be reviewed on a de novo basis. Could we cut to the chase? Yes, Your Honor. And have you tell us, in that you maintain that the district court applied the wrong standard of review, just what findings of fact were somehow not reviewed correctly or what specific conclusions were drawn by the district court? Because I'm not clear in considering your argument in the briefs, just what specific portions of the district court opinion you believe were wrong. I will answer that, Judge Smith. First, I wanted to note that in the district court's opinion itself, the district court judge said we adopt all of the findings of the bankruptcy court. First, there was no explicit determination or mention by the district court of any factual findings or inferences of fact drawn by the bankruptcy court with which the district court disagreed. So let me now answer your question specifically. What the district court did was say things like the bankruptcy court erred in finding that there was a benefit to the estate. Finding? In finding? Yes. The word finding? The district court, I believe in its opinion, talked about the bankruptcy court making an error with regard to the inferences that it made from factual findings. For example, that the district court, at least a substantial portion of its opinion, took and iterated the two factors involved in the good faith inquiry, taking the language of integrated telecom and also SGL. And went then beyond that. And I'm looking right now at JA23. It's page 10 of the district court's original opinion. And it says the bankruptcy court erred in concluding that debtors had met their burden of proving good faith. Now, first we have the word conclusion, which doesn't suggest to me a finding of fact. But beyond that, we have clearly the reference to meeting a burden of proof, which is clearly a conclusion. Your Honor, what the district court did, however, prior to that, was to make statements such as the record, I'm not persuaded by the record, for example, that the filing of the bankruptcy case was not simply a litigation tactic to gain an advantage in litigation. Whereas the bankruptcy court found after. Actually, the district court says that next, after what I just read to you. And it says, second, the record supports the conclusion that debtors' primary objective in filing the petitions was to gain a tactical advantage in litigation. Except, Your Honor, that the bankruptcy court specifically found on the factual record that was established after almost one year of discovery and a two-day trial at which there was one live witness that was the debtors' representative that testified that the bankruptcy filing was not, in fact, a tactical maneuver in connection with that litigation. What the bankruptcy court also found, Your Honor, was that the debtors had a good faith belief based on all the claims that were existing. You have to recall that there were, in addition to the Thiebaud litigation that the district court focused on and that BEPCO complains about in regards to the filing of the bankruptcy case, there was also litigation in California. There was also litigation in Oklahoma. There were regulatory proceedings in California by the EPA. Which is the major? Which is the more important? Which involves the most money? The most money? I think the most money alleged was the Thiebaud case, but the money alleged or potentially at risk in the other actions was not insignificant. It was still in the millions of dollars. Go ahead. If the district court accepted all of the facts that were found by the bankruptcy court, let's go back to Judge Smith's what I thought was his initial question, where did the bankruptcy court err? I'm sorry, Your Honor. I'm sorry, the district court. Well, what the district court did in erring was looking at the facts as found by the bankruptcy court, including the inferences drawn by the bankruptcy court. It adopted all of those facts. And adopted all of them, but said, basically, I disagree. On my review of the record, instead of identifying any fact that was clearly erroneous or any misapplication of fact to the law, because both courts applied the same legal precepts and the same legal authority, so there was no error of law either that the district court found. The district court simply said, I disagree. My review of the record suggests something different. The district court views the bankruptcy court's decision for abuse of discretion. Correct. Did the district court say that the bankruptcy court abused its discretion in coming to its conclusions? Your Honor, I don't, standing here right now, I don't know if the district court used those exact words. What I do know is that when you read the district court opinion, there are several instances with regard to the reasons for the filing, the benefits from the filing, whether or not the filing was simply a litigation tactic that the district court simply disagreed with the facts found. So you can't discern from the record whether the district court, in fact, said that the bankruptcy court abused its discretion. Your Honor, I don't believe, I'm trying to answer your question as forthrightly as I can. I don't believe the district court said that, but standing here right now, I can't cite to a specific. Just one more question. Yes. Do we now review the district court's decision, or do we review the bankruptcy court's decision for abuse of discretion? Well, Your Honor, I think you do both. I think you review what the district court did and determine whether or not the district court applied the right standard in coming to the decision that it came to. But we recognize that this court has an ability to look at the record and determine based on an abuse of discretion standard whether or not the bankruptcy court was correct. And we think that it was based on the voluminous record that was presented,  that the bankruptcy court correctly found that the bankruptcy was not filed as a litigation tactic in light of all the other claims. Could you tell us what is the status of the Louisiana state court action right now? Standing here today, Your Honor? Yes. I am not personally involved in the Louisiana action. Perhaps Mr. Heisenberg would be better able to advise the court, but my understanding is that that action is in the discovery phase, that I'm not sure if there's a trial date set in that, but it is proceeding in accordance with the local rules in Louisiana. But not being trial counsel, I probably don't have as up-to-date information on that as I might. Would GSF have conducted the insurance review regardless of whether the debtors filed for bankruptcy? Your Honor, I can't answer that question, and it's probably better directed to Mr. Heisenberg, who represents GSF. And I don't want to dodge Your Honor's question, but I will tell you that the insurance review was done in connection with the bankruptcy. My understanding, but I'll again defer to Mr. Heisenberg, but my understanding is that is the way that the parent companies believed it was best to do, that the breathing spell that would be obtained by the bankruptcy, that benefit from the ongoing litigations in Oklahoma, California, and Louisiana would allow that process to go forward. Isn't it critically important, as Judge Slobiter's question suggests, whether it could have been performed outside of the bankruptcy, rather than simply the fact that it was conducted pursuant to or during the course of it? To answer that question. Analytically for us, isn't that important? It may be, to this extent, that to answer your question directly, I suppose it could have been, but could it have been done as effectively and efficiently outside of bankruptcy as inside of bankruptcy, where all the claims are centralized in the forum and the breathing spell? Did the bankruptcy court make any factual determinations about that, as opposed to merely a general finding or observation that it accomplished this, as opposed to a comparative analysis as to what was accomplished or what would have been? I don't know that the bankruptcy court directly addressed that factual finding, but I do know that the bankruptcy court found that the bankruptcy allowed that process to go forward in an effective and efficient manner, and that the debtors did not have the ability in the bankruptcy court's view to fund that review outside of bankruptcy. I am confident that those facts were found by the bankruptcy court and are supported by the record. So could it have been done? Yes. The district court very carefully went through each of the pending actions that were apparently the basis, that were the basis of the bankruptcy court's finding that it made sense that the bankruptcy petition was filed in good faith, and sort of one by one knocked them down like bowling pins. Where did the district court err in its analysis of those pending actions? Well, Your Honor, I'm not sure that the district court erred in simply restating what those actions were, but the testimony at trial before the bankruptcy court was to the effect that these pending actions weighed on the debtor's decision and impacted the debtor's decision to file. Yes, but the district court didn't think much of that argument, obviously. Well, I would. Because it went through and showed how each one was not a significant or a real problem. But I would suggest that that is an area where the district court erred because it did not accept the bankruptcy court's factual findings, which were to the effect that the debtors believed that they were significant and meaningful and impacted upon the decision to file, and the bankruptcy court agreed. Was there ever an assessment of GSF's exposure at about the time that Santa Fe was in bankruptcy? Your Honor, I apologize. I didn't hear the first part of your question. Was there ever an assessment of Santa Fe's exposure at the time that it was in bankruptcy? In other words, what it stood to lose as a result of all of these claims? An assessment of Santa Fe's exposure with regard to all the claims. Liability, exposure, money. Money. That's what we're talking about. Yeah, well. That's what we're always talking about. Absolutely, Your Honor. Certainly there was assessments of the debtors' potential liability. By whom? And where are they? Well, the assessment was made by the persons responsible for the windup of the debtors' affairs, and that impacted, again, and influenced the decision to file for bankruptcy because there were massive claims, not just from the Tebow action out there that needed to be dealt with and very minimal and scarce assets to deal with them, including the insurance. Minimal and scarce assets. Mr. Demme, this was about as sick a puppy as, in fact, this was a dead puppy. There was nothing going on with Santa Fe, was there? Well, with Santa Fe, the assets include the insurance that we've talked about, include funding, and we have a settlement with the GSF entities, the parent companies, that would put about $2.8 million into the case to deal with these kind of liabilities, in part related. Is that $2.8 million the London market policy? No, Your Honor. The London market policies were identified as part of the insurance review. The limits there, we believe. Where does the $2.8 million come from? The $2.8 million is the cash contribution that the parent entities would make pursuing the settlement between the debtors and the parent companies that's embodied in the plan, and it's reflective of the potential claim that the debtor entities might have up the stream against the parents in connection with the dissolution of Santa Fe Minerals. I think that you've sent us to, is it Mr. Eisenberg? Mr. Eisenberg represents the parent companies. I understand that. You've sent us for our questions to Mr. Eisenberg. Why don't we hear from, your red light is on, and why don't we hear from Mr. Eisenberg? Thank you, Your Honor. We obviously have questions for him. May it please the Court, Philip Eisenberg with the law firm of Locke, Lord, Bissell, and Liddell. Okay. Tell us our first question. What's the status of the Louisiana State Court action? It's bogged down in procedure and in an insurance review project in the London market. It's pending. It's been pending now since the stay was lifted, and we believe that the stay was lifted in error by Judge Gross, that it caused due process problems in our ability to prosecute the debtors' ability to prosecute the bankruptcy. The bankruptcy had to be stayed. How so? How would you be prejudiced if that stay is lifted? The stay caused the debtor to not be able to move forward with the estimation process in the bankruptcy. There's a pending. Will you please explain that? Yes. There was a motion to estimate filed of the BEPCO claims for purposes of the plan that's pending, and a pending 1919 settlement. Estimate the claims by whom? By BEPCO, the appellee. Their claim is they settled for $20 million. Right. Isn't their claim in Louisiana for $10 million? Have I got that figure wrong? We don't know what their claim is. It's a straw man. I don't understand what you're estimating, why that would be a major project. Well, because under Louisiana law, they have no claim against the debtors. So why are you worried about it? Well, we weren't worried about it. We moved to estimate it in the bankruptcy, and we were unable to do it because the judge stayed. Well, who is going to estimate it? Why doesn't it just get tried and decided? I don't understand this extra procedure. Yes, Judge Slobiter. If you could do that in a timely fashion, as Judge Gross thought originally, then that would have been appropriate. But it's so unduly delayed the proceeding. It's not going to be more than $20 million, right? It will be no more than $20 million, as far as we know. And you have one insurance policy that might cover it, and that's a finite sum. There's a series of up to $600 million in insurance, Your Honor. Ah, that's nice. It's not clear that the London policies cover BEPCO's claims. Isn't that right? Well, Judge Gross thought there was a substantial likelihood that they would. Who would decide that, the Louisiana court or the bankruptcy court or us? Right now, it is pending. There's a suit by BEPCO in Louisiana against the insurance. I know. That's why I asked you what's happening in that. That's why we started out with this. Yeah, but who would decide whether the Louisiana policies cover BEPCO's claims? At this point, the only place where that is pending is in Louisiana. The debtors, if the case was not stayed, could bring an action in the bankruptcy court and adversary proceeding. Well, why would they do that? If the stay were lifted, why wouldn't the Louisiana court then be free to go ahead and decide that? I don't understand. Well, they would be free to decide it, but I don't think that they have the same issues. BEPCO has the right of direct action in Louisiana, but the debtors have a right for defense costs. Why would you pay defense costs? Wouldn't that be paid by the insurance company? Well, we would hope to. They've denied it so far. We believe it's a wrongful denial and it's a major asset of the estate. It would render the estate administratively solvent. But wouldn't it make sense just to lift the stay? And the only reason the stay is on now is pending appeal, I think. And when we finish with this, well, depending on what we decide, but if we decide that the stay should be lifted because it's only pending appeal and once the appeal is decided, that's the end of it. Then it goes ahead and it gets decided in Louisiana. I believe – I mean, why would you not want that to happen? Well, I believe that from the standpoint of the parent companies, they were of the opinion to invest in this bankruptcy based upon the fact that they would have administrative claims. This was an insolvent company. Yeah, but the parents are really rich. The top parent is billions of dollars. But that's a fundamental tenet of Delaware law, and I think that's where we're getting confused here. We have a subsidiary that is a separate company, and we have a ultimate parent that is financially viable. But Delaware law says these are separate companies, and they get treated as separate companies. Back to the stay, BEPCO is sitting on a $20 million settlement, the value of which is eroding with every passing day. I mean, don't they have a right to get moving to recover their $20 million settlement? They've been attempting to do that in the Louisiana action right now, and it's been pending for a year and a half. And I submit to you that if we pursued this – But you people wanted a stay of the Louisiana action. We did because we thought – So that you're blocking BEPCO from doing that. No, because we thought the most efficient way for not just BEPCO, but for all the creditors. And Sins and Troy are out there as well, and they have made $5 million claims each, which are significant claims, asbestos claims, and there was a specter of many more claims like that coming before the filing. And those claims have now been winnowed down through the bar date. The insurance policies have been created through the investment of the administrative expense by the parent companies. And the fact that these were created in the bankruptcy, and now BEPCO wants to run away with the assets of the bankruptcy without having the ability of the bankruptcy to administer this and recover their administrative expenses, I would submit to you is what the error is. The district court never filed abuse of discretion. Was it your decision to go into bankruptcy? No, it was not. Santa Fe? No, well, it was Santa Fe. Santa Fe is not my client. I represent Global Santa Fe Corporation. You also represent the Administrative Services Corporation? Yes, Your Honor. Excuse me? Yes, Your Honor, we do. And that Administrative Services Corporation just happened to lend considerable support and aid to Santa Fe in the course of both pre-bankruptcy and post-filing, did they not? They did, Your Honor. FAR, is it? F-A-U-R-E? Yes, Your Honor. Is an officer or an agent at least of the GSF entities that was very much involved in the Santa Fe administrative effort at least with respect to the bankruptcy? Yes, he was, Your Honor, and he was cross-examined. He certainly was. For hours. I read that testimony. In the bankruptcy court, and the bankruptcy judge weighed that testimony. He had missed the FAR of the stand, and he was very effectively cross-examined. And even after that test, which is why the abusive discretion standard is in place and why you cannot substitute your inferences from findings of facts for the bankruptcy judges, which is where the error is here. Well, we know that we can't do that. Who paid the administrative costs that you keep talking about, which you say is what you want back in the bankruptcy? Some of them were advanced through a debtor-in-possession financing motion that Judge Gross approved. Yes, but who? Who paid the money? Was it one of the parents? Some of the money was advanced through entities holdings, which was through a term note before the bankruptcy. That's EHI. Right. Which is the parent of Memorial. That's correct. Okay. Then subsequent there was a debtor-in-possession financing order placed, and the money came through Global Santa Fe Corporate Services. Which is one of the parents. No, it's just an affiliated company that didn't exist when all this environmental issues arose back in the 80s. It existed only for purposes of offering administrative support and similar services. To a family of companies all over the world. Yes, Your Honor. So the parent does, I thought you answered one of my questions or one of somebody else's questions by saying that the parent, Delaware law, keeps the parent out of this completely. But it turns out that the parent, one of the parents, including the multi, multi, multi-billion, billion dollar corporation at the very top of this pyramid, do have interests. They do, Your Honor. Okay. And they filed a settlement motion, a 1919 motion, in the bankruptcy court for approval by the bankruptcy judge under the bankruptcy rules. Which would not have given BEPCO anything, right? No. It absolutely had an option for BEPCO to take the insurance rights or to take a million dollars that would be funded in a plan. And as part of that process, there would be an estimation of BEPCO's claims in the bankruptcy court, which is done all the time in bankruptcy with claims that you don't know what their amounts are. Okay. And because the stay was lifted and that matter is pursuing in Louisiana, Judge Gross had to lift, stop the bankruptcy proceedings. And so we submit that that was an error. Excuse me, Judge. Your red light's on. Yes, Your Honor. Judge Fuentes has a question. One of the basis for the district court's decision is the curious timing of the filing of bankruptcy in this case. Because the evidence, it seemed like the evidence against Santa Fe was mounting and you were about two months away from trial when all of a sudden you went into bankruptcy. To take, according to the district court, to take advantage of the TBO action. Could you comment briefly on that? Take advantage of the automatic stay. And I'd be glad to comment on that. The issue that BEPCO raised that they were going to raise single business enterprise against the parents happened in June of 2006. The bankruptcy filing was 10 weeks later. The briefs sort of put those together without any discussion. And I would submit to you that Mr. Farr's testimony stands for the proposition that during those 10 weeks they measured not just the BEPCO case or the TBO case, but these other pending cases and the possibility of additional oil field legacy cases and just how much money the parent companies would have to put in absent of bankruptcy. And Mr. Eisenberg, we really have to hear your time is way up and we really have to hear from BEPCO. Yes, Your Honor. Thank you very much. We'll hear from one of you on rebuttal and we're going to let the two of you decide who's going to get up on rebuttal. Thank you. Just thank you. Sorry to break in, but we do have time problems. Good morning, Your Honors. May it please the court. Gregory Wertheiser of Morrisicles, our Centennial LLP for BEPCO LP. You went through that very fast, but that's all right. I'll try to slow down, Your Honor. No, that's okay. Uh, Your Honor, uh, I, I think just a couple of things about the context of this case. Uh, what we have here are two debtors, one of which is a dissolved irrevocably dissolved corporation. One of which is a holding company that was previously, uh, a dissolved corporation. And the evidence below is that it was, uh, uh, brought back from dissolution on the advice of counsel and litigation. Please talk more clearly or into the mic. Yes, Your Honor. Go ahead. I'm mumbling. Uh, and the evidence below, I think, makes clear that there were virtually no assets in these estates aside from insurance policies. Yeah, well, is that really what BEPCO is hoping to get? Is, I mean, if the only assets are the London market policies? Uh, BEPCO has sought to be made whole through, through two means, Your Honor. First, to recover against the London market policies and the state has been lifted there. Uh, litigation in Louisiana has been brought. It is in its preliminary stages right now. Uh, the London market insurers, uh, have taken a position that inadequate information has been provided about the policies. Who would decide if the London policy, the London market policies cover BEPCO's claims, which were assigned to it? Uh, currently, uh, the Louisiana court would make that decision. And is that in the bankruptcy? What court is that in Louisiana? That's a state court in Louisiana, in Avoyles Parish, Louisiana. A state court. Okay. Does BEPCO, uh, made whole by recovery of its $20,000 settlement? 20 million. 20 million. 20 million. Big difference. Uh, BEPCO's, uh, settlement was bigger than the $20 million. Uh, the cash component of the settlement was 20 million. In addition to that, they agreed to do a limited form of, uh, reclamation of the property, um, which they funded. So they have additional. That was part of the settlement. That's part of the settlement, Your Honor. That's correct. Uh. Has it been done? Uh, I believe that process is largely, although not entirely complete at this point. Uh, I don't have the figure at my fingertips as, as to what it costs them. Could you describe just how BEPCO has been frustrated in its efforts, specifically by the filing of the bankruptcy, and more recently by the stay? Yes, Your Honor. Um, by the filing of the bankruptcy, procedurally, as Your Honors have noted, we were approximately two months from trial. Uh, the issue of, uh, Global Santa Fe liability, uh, had been raised in the state court litigation, both by the plaintiffs and by BEPCO. Uh, and we both indicated intent to pursue them on a. They were co-defendants, really. I'm sorry, Your Honor. They were co-defendants in the Louisiana trial. They were funding the defense of that litigation, although the suit at that point was only against Santa Fe, uh, minerals. Uh, they disclosed, and this is in the record below, they disclosed Santa Fe's dissolved status. I'm sorry, who is they? Uh, Santa Fe disclosed its, its dissolved status to the plaintiffs and to BEPCO, uh, whereupon the plaintiffs and BEPCO informed them that they intended to pursue the parents up the chain, uh, for the liability. Uh, within a few weeks, that was reported in Global Santa Fe's, uh, SEC filings. Excuse me just for a minute. Yes, Your Honor. Is that a circular suit or is it a state court? What is the, what is the basis of the Louisiana suit? Uh, it's, it's a, it's a uniquely Louisiana doctrine of recovery that allows, uh, landowners to recover, uh, damages, uh, uh, for, to their property that occurred in connection with, uh, mineral leases. Um, and, uh, the nuances of it are probably beyond me, Your Honor, but it is something you would only find in Louisiana. Oh, okay, but it's not, it's not a circular suit. No, it is not. It's not a federal suit. That's correct, Your Honor. Okay. It's Napoleonic code based. Is that what you're telling us? To a large extent, yes, Your Honor. Okay, I'm sorry. Go ahead. Of, of course. Um, and, and, and, so at that point in time, uh, BEPCO had indicated its intent to proceed against the parent. Um, within two months, the bankruptcy was filed. That process was forestalled. Uh, one of the first acts that occurred. By the automatic stay. By the automatic stay, correct, Your Honor. Did, did, um, you, well, you wouldn't have been the one to do it at that time. Did anybody ask that the automatic stay be lifted? Uh, Your Honor, with approximately a month into the case, we, we filed a motion asking for the automatic stay to be lifted. Was that after you had paid the 20 million and gotten the assignment? At, at that time, Your Honor, we had not paid the 20 million. Uh, the case was still scheduled to go to trial, uh, that fall. And, uh, we sought to have the stay lifted at that point to bring Santa Fe Minerals back into the litigation. And also, at that point, we, we attempted to file a third-party petition against Global Santa Fe and the insurers, uh, to bring them into the litigation. You knew about the insurers at that time? We knew about some of the, I got the feeling that nobody knew about the insurers until this insurance review was conducted. Is that right? Uh, Your Honor,    the London market policies were discovered, uh, through the insurance review. And, and, and, and, and, and, and, and, and, and,      and the, the London market policies of course was discovered through the year review project. Uh, we had knowledge of certain of the insurers who we had named originally in that third-party petition. There were other insured that have now been included in the suit that Is pending currently. Were they part of London market, whatever this London market policies are. Are they part of that? I don't know the answer to that Your Honor, there might've been some overlap but I, I'd be, uh, guessing. Ok. Let me go back to the reason to go into bankruptcy. Your claim is that the petition was filed in bad faith. Yes, Your Honor. And, and Judge Slover mentioned a host of claims that were pending against Santa Fe before. There were about five separate claims. There was, of course, the Tebow action. Yes, Your Honor. As well, there were two separate investigations that Santa Fe was being threatened with. And then there was the recent realization that the disillusion that    I, I, I don't know the answer to that. I, I, I, I don't know the answer to that. I, I, I, I, I, I'm afraid to go into bankruptcy. Uh, your honor, I, I think certainly if this were either operating enterprise or a debtor with assets that required the protection of bankruptcy to preserve, uh, I, I would accept the notion that those were good reasons to put the company into bankruptcy. Well, and in, in, in fact, that goes to the. Mm-hmm. Heart of the good faith test. That's right. I mean, the, the jurisprudence of, of this circuit presents us, you, the debtors with, with two questions that are relevant to good faith, to the good faith inquiry. And this is what Judge Robinson focused on. And whether the petition serves a valid bankruptcy purpose and, and what that means, we have said, by preserving a going concern. Has anybody at any point attempted to suggest that the bankruptcy filing was an attempt to preserve a going concern here? I, I don't think anybody has ever taken the position. All right. So it's the alternative then that the debtors have tried to demonstrate and that would be or maximizing the value of the debtor's estate. And I hope on rebuttal one of your colleagues on the other side will speak to that because we just didn't get time during Appellant's presentations. How, how did debtors here fail to demonstrate a maximization of value? Your Honor, we submit there were several ways. The debtors here really had three principal assets. Insurance, the, they contend the clauses of action against the parent companies were state property. We contend otherwise. That issue was never determined as to whether it was property of the state or not by the bankruptcy court. And third, there's a group of rights that we call distribution rights. Those distribution rights, Your Honor, were primarily there was an already completed class action settlement that they were entitled to recover a few thousand dollars under. There was an intercompany claim and one or two other things but they were not substantial. I believe in total less than a million dollars. Somebody said they were potentially millions of dollars or those two asbestos claims? Your Honor, the Sins and Troia plaintiffs brought asbestos claims against a predecessor of Memorial and among numerous other defendants that were named in the suit arising out of an office building I believe that it owned in California. There may be multi-million dollars worth of damages alleged in that suit. I believe the record below shows that there are other policies that may provide coverage for that loss and the record is clear that if there's coverage under  those policies are separate and completely distinct from the policy that ensures potentially DEPCO's loss. So there is no competition for insurance claims. I was joined with the multi-district asbestos cases. Do you have any idea? I don't know the answer to that, Your Honor. I just wondered. It seems strange to have a couple of these asbestos claims out there. Go ahead. I'm sorry. No, that's fine, Your Honor. I think it's just a straight premises liability case. You said there were three potential assets. Yes, Your Honor. One were the claims against the parents which we were told that Delaware law doesn't allow you to assert. There's certainly a dispute about that issue. They would contend that Delaware law applies and would limit our rights to pursue the parents. We have argued otherwise that under the Louisiana law and I believe it's Wyoming which is Santa Fe's state of organization that we would have the rights to pursue those. Those were issues as the case comes before Your Honors were never decided by the bankruptcy court. But I think more broadly when you're discussing the claims against the parents, we know here in the context of this case as it now exists that there's really only two creditors, creditor groups that have sought to pursue those claims. BEPCO and the Sins and Troy Appointments also articulated a claim like that. Neither creditor has suggested at any point in the proceedings up to now that they were better pursued or resolved through the bankruptcy cases. Both those claims were not pursued and I think that case was... In Louisiana? In our case we would probably pursue them in Louisiana. I couldn't speak to where Sins and Troy are.  bring those claims. Can I get back with you to the abusive discretion standard because to agree with you we would basically have to affirm the district court and the district court's conclusion that the bankruptcy court abused its discretion. So maybe you can tell me briefly how did the bankruptcy court abuse its discretion? It was an abusive discretion in concluding that the bankruptcy petition was filed in good faith. Certainly there, Your Honor, and I think the bankruptcy court abused its discretion in one principle way was in its articulation of what was a valid bankruptcy purpose. The bankruptcy court here seemed to believe that because certain things were done after the bankruptcy case was filed that that sufficed to make them supportive of a valid bankruptcy purpose. Isn't that conclusion entitled to great deference by the district court? Well, I think the bankruptcy court erred in articulating the standard. It said simply because they were after the bankruptcy case and not on account of the bankruptcy case or things that could not have occurred without the bankruptcy case having been filed. For instance, the insurance review project, Your Honor, it is clear Let's say we agree with the district court on that conclusion. What about the reasons for going into bankruptcy which are to minimize its  consolidate all the claims, have one ruling, preserve the bankruptcy estate and so forth? Right, Your Honor. Are those valid reasons for going into bankruptcy? Well, bankruptcy really doesn't add anything to that process as a result of the bankruptcy proceedings. Wouldn't the debtor's resources be spent on fighting all of these claims separately so that it would not be maximizing the resources for the creditors? Certainly in a case where the debtor had substantial assets that it needed to preserve for the benefit of creditors, that argument might have some more weight, Your Honor. I think one of the things that distinguishes this particular case, even from the other cases that this Court has decided, such as the Skinner decision, is that this debtor really had very minimal assets. There was no suggestion and I don't think there's any real suggestion in the record that creditors are competing for a limited pot of assets. You have here, basically, BEPCO and the Sins and Troy Appointments at this point. BEPCO would like to pursue London Market Insurance Policy proceeds and clauses of action against the parents who are highly solvent entities that realized over a billion dollars in net profit in 2006. And the Sins and Troy Appointments who have separate policies they'd like to proceed under and may also want to pursue similar clauses of action against the parent, but I don't think there's ever been a suggestion in the record that the parent couldn't withstand both those attacks. Just returning to the distribution rights that I discussed briefly, Your Honors, and I see my time is running out. I think we were all recovered with minimal effort. Your Honor, I didn't get to discuss our alternative means. If I could just have a couple of seconds. Go ahead, finish your sentence. Thank you. Our alternative means for affirming the result reached by the District Court. Do you rely on our decision in integrated telecom? That is probably the principal decision that we rely on, Your Honor. We think the Skinner decision is also  although unreported and not binding on this panel, is also worth a close look. But integrated telecom certainly is, not to mention the fact that the author of that opinion is sitting on this panel. Yes, he is, Your Honor. I simply just wanted to briefly mention that under Section 112B4A the Bankruptcy Court did make findings that established that there was cause to convert or dismiss for continuing loss and diminution of state and inability to rehabilitate. I'm sorry, would you just repeat that? Sure, I'm sorry. I didn't get it. Under Section 112B excuse me, 1,112, 1,112, B4A of the Bankruptcy Code, it articulates cause for conversion or dismissal of cases and we argued and the Bankruptcy Court found that cause The District Court did not reach cause. Did not, did not. This would be an alternate grounds for affirmation of the District Court. The Bankruptcy Court went on to make it clear that the bar should be quite high in circumstances where the Court has found cause based on continuing loss and diminution of state and inability to rehabilitate. But you think we could affirm on the basis of the District Court without going into cause? Yes, yes, I certainly do. Okay. Thank you. I think we understand your position. Thank you very much, Your Honors. Thank you. Well, have the two of you decided which one is going to Mr. Eisenberg? Mr. Eisenberg, let me ask you a question. Um, the precedent in this Court is that the desire to, at least as I understand it, that the desire to eliminate claims against the estates doesn't establish good faith as a matter of law, right? That's what I think Integrated Telecom held. In and of itself, yes, Your Honor. Okay. So, can you tell me why we shouldn't follow that precedent in this case? Quite simply, and it's to maximize the value of the assets for all of the creditors, and think of it as a leisure. You have the creditors that have a potential right against all these assets, and you have the assets. And What assets? Well, we There are no assets. There are three very valuable assets, and I'll go through them. There was the dividend upon dissolution from the Wyoming dissolution of Santa Fe Minerals, which in the bankruptcy they found out instead of being $500,000 was $778,000. But that's in the bankruptcy, and the question is good faith to go into bankruptcy, and we submit there was. Well, why don't we stick to that? What was the good faith? If it can't be to eliminate claims against the estate under, as I read, the integrated telecom, but we'll find out if that's wrong, then what was the good faith? The good faith was there was at least $500,000 that needed to be distributed to a pool of creditors. And it wasn't just Tebow that had a right to this dividend from dissolution. It was all of the other claimants that Judge Gross found existed at the time and that potentially existed and could come forward and put a claim in the bankruptcy. Other legacy environmental claimants in Louisiana under state law. How did the District Court handle that issue? They didn't address it at all except to say that those weren't real claims. And Judge Gross looked at each and every one of them and thought that they had a very legitimate bankruptcy purpose. You had the $500,000, you had the potential for insurance rights, but no administrative funds to create the London market policies. They did not have the London market policies and they have good terms and conditions for environmental claims. One very simple example. So instead of having seven piecemeal actions going on, each one trying to get that $500,000 and be the first one to get there and have Santa Fe try to defend those with limited resources at all, you file a bankruptcy to make everybody come to one place and you have a pool of assets that either exist or can be maximized through the bankruptcy process through the use of administrative funding as was done here in creating the London market asset. And clearly the proof is in the pudding. Just for clarification which is probably completely unnecessary, but I'll ask it anyway. You have never maintained have you that one of your purposes was to preserve a going concern. You've put all your eggs in the basket of maximizing value. Maximizing value. Maximizing the potential insurance coverages that were out there because they hadn't found them all yet. Maximizing Have they found any? Yes. They found the London market policies. But they didn't find that until after the insurance review. But they knew they would be out there. They simply needed the funding to conduct the insurance review. How did they get the funding afterwards that they needed? They went to the parent company that there might be all these valuable assets that were the insurance company London policy. Judge Gross specifically found that the bankruptcy filing gave the breathing space But the breathing space is not the same as the money. But the money came during the breathing space. Well But so what? I mean so what? The mere fact that it happened then doesn't really tell us a lot in the inquiry that asks whether this could have been accomplished outside the bankruptcy, does it? But what Judge Gross did It's merely a historical fact No but it's not historical. It actually happened during the bankruptcy and Judge Gross was part of the process. When the original motion to dismiss was filed in October of 2006 Judge Gross ordered discovery and part of that discovery was the insurance policies that were potentially applicable to the Tebow claim. The BEPCO people served discovery based upon Judge Gross allowing them to be in the bankruptcy to get those policies discovered and the insurance review process was the BEPCO has now taken that asset and tried to run to Louisiana out of the bankruptcy court said that the debtors administratively insolvent when they have defense cost claims so you have assets on the one hand and you have multiple creditors on the other hand and those multiple creditors have now winnowed down yes we're down to two but that's what happens in a bankruptcy you start with a lot of creditors you get the claims addressed and then you deal with the rest of them in the plan. Thank you and what happens in this court is that I see the red light is on. Thank you very much thank you all we will take this matter under advisement.